[No. C008708. Third Dist. June 25, 1991.]

CHICO POLICE OFFICERS' ASSOCIATION et al., Plaintiff and Respondents, v.
CITY OF CHICO et al., Defendants and Appellants.

[black redaction bar]

COUNSEL

Robert G. Boehm, City Attorney, and Lori J. Barker, Assistant City Attorney, for Defendants and Appellants.

William L. Williams, Jr., for Plaintiffs and Respondents.

OPINION

DAVIS, J.—

## INTRODUCTION

The City of Chico and its chief of police, U. F. Bullerjahn, challenge a judgment that Chico police officer Terry Moore engaged in speech protected under the First Amendment when he wrote an article in "The Centurion!" newsletter which characterized police department management personnel as the chief's "lackeys." "The Centurion!" is a publication "Expressing the Thoughts and Concerns of C[hico] P[olice] O[fficer's] A[ssociation] Members." At the time of this incident, Moore was the Chico Police Officer's Association's president. The court granted Moore's petition for a peremptory writ of mandate, ordered appellants to vacate their disciplinary action against Moore and to remove any reference to that action from his personnel file. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Respondent Chico Police Officers' Association (hereafter, the Association) is an employee organization representing the law enforcement bargaining unit which consists of law enforcement employees of the city. Terry Moore is a police officer with the city's police department and president of the Association.[1]

The disciplinary action at issue arose when a copy of the December 21, 1988, edition of "The Centurion!" was posted on the bulletin board at the police department which is reserved for the posting of Association materials.

---

[1] "Employee organization" means any organization which includes employees of a public agency and which has as one of its primary purposes representing those employees in their relations with that public agency. (Gov. Code, § 3501, subd. (a).) The Association also alleged that it was a "recognized employee organization" which has been formally acknowledged by the public agency as an employee organization that represents its employees under section 3501, subdivision (b). The city denied this allegation for lack of sufficient information and belief.

The three-page edition discussed various topics. The focus of the lead article was job stress associated with police work. At its conclusion, the "existence of management" was added as another stress factor. It was pointed out that justice should be "meted out without regard to rank or position. Afterall [*sic*], a double standard would serve no functional purpose, other than to further sever already strained relations between management and the employees." Two incidents in the Chico office were discussed. The first involved Chief Bullerjahn's failure to file a collision report as required by department policy and procedures whenever a city vehicle is involved in a collision. The chief only filed a city property damage report. The second involved damage to a city vehicle by an administrative assistant who filed neither report. A different incident relating to officer safety was then discussed. An incident was described in which an ex-felon told a clerk at the department that he would kill Moore. The clerk informed Captain Horton, who told the clerk to tell him to come back when Moore was available.

Declaring that "management has the absolute right . . . to mismanage," the edition then stated that " 'The Centurion!' is the only watch dog available to monitor the chief and his lackeys, because no other form of accountability exists. What does exist is a double standard, and like a malignant cancer, is [*sic*] continues to grow larger." The edition concluded with the following comment: " 'The Centurion!' reminds you that the Chief is standing between you and a contract, with his hands in your back pockets: squeezing your wallet on one side, trying to take your 4/10 on the other side, and all this while you thought you were simply getting—uh, the shaft. Resist for now the temptation to revolt."

That same day, Chief Bullerjahn revoked the Association's permission to use the bulletin board and began an internal investigation, headed by Captain Horton, regarding the posting of "The Centurion!" on the board. Because Moore was the only person issued a key for the bulletin board, he was directed to provide the names of all employees who had supplied him with information relative to the edition and to identify the author of the material involved.

The Association requested that the city manager review Bullerjahn's action in revoking its right to use the bulletin board. In response, the city manager solicited an opinion from the city attorney regarding Bullerjahn's right to order the removal of "The Centurion!" and to restrict the Association's use of the bulletin board. The city attorney concluded that Bullerjahn had acted within his authority in removing the edition because (1) the publication did not identify the employee organization responsible for

publication as required by the Chico Municipal Code;[2] and (2) "portions of the publication contained speech which was not constitutionally protected and which could appropriately be considered disruptive to City services" under the city's municipal code.[3] The city attorney concluded that "such statements are not protected speech under the First Amendment, since they do not appear to constitute matters of 'public concern' [citation] but rather, reflect the author's various disputes with the City's police department and his or her superiors."

During his personal interview with Horton and in his written response to the chief's memo, Moore admitted that he had posted the edition, was aware of its contents, and had authored certain portions of it, including the language quoted above. He declined to give the names of employees who supplied him with other materials submitted for inclusion in "The Centurion!," including a copy of Bullerjahn's traffic accident report, because they were submitted confidentially.

Following this interview, Horton concluded that Moore had violated numerous departmental rules and regulations. Moore was provided with written notice of Bullerjahn's intention to take disciplinary action in the form of a written reprimand for violating three departmental orders: "insubordination," "conduct toward others" and "notices."

In his final decision to place a written reprimand in Moore's personnel file for violating these orders, Bullerjahn stated that his "rationale remains the fact that you, in fact authored portions of the 'The Centurion!' dated December 21, 1988, which contains language that is insulting, rude, insolent and demeaning, which ridicules superior officers, and is prohibited for posting in our department. The fact that you insist you are protected from this disciplinary action because you wrote and posted the material as an officer of the police officer association has no bearing on the fact that as an employee you are prohibited from both making and posting such disparaging remarks. Further, in a paramilitary organization, such as ours, undermining

---

[2]This conclusion was based on the fact that the newsletter stated only that it "express[ed] the thoughts and concerns of CPOA members" but did not state that the Association was either responsible for or approved the document.

[3]The municipal code involved, Chico Municipal Code [section] 2R.78.010(F), states: "F. Use of Bulletin Boards. Recognized employee organizations may use portions of city bulletin boards under the following conditions: [¶] 1. All materials must be dated and must identify the organization that published them. [¶] 2. The city reserves the right to determine what portion of the bulletin boards are to be allocated to employee organization materials. [¶] 3. The city manager may remove materials which are considered disruptive to the city services. [¶] 4. Unless otherwise agreed upon, materials posted will be removed 31 days after posting. [¶] 5. An employee organization that does not abide by these rules will forfeit its right to have materials posted on city bulletin boards."

and disrupting the agency's efficiency and administrative authority through rude and personalized references about fellow or superior officers is not to be tolerated."

As authorized by the city's rules, Moore responded to the written reprimand and requested its removal from his file. He argued that the actions were taken against him in his capacity as the president of the Association in violation of his statutory and constitutional rights. He submitted copies of all past issues of "The Centurion!" and pointed out that management had been criticized in many other editions without similar investigations. This request went unanswered.

Respondents thereafter filed this petition for writ of mandate (Code Civ. Proc., § 1085), alleging that by their action, the city and Bullerjahn in his official capacity "have interfered with, intimidated, restrained, coerced, and discriminated against . . . Moore, the employees in the law enforcement bargaining unit, and the association because of the exercise of their lawful and protective representational and/or speech activities . . . ." They requested a peremptory writ commanding appellants to withdraw the letter of reprimand and to cease interfering with the protected rights of Moore and the Association.

In its opposition, the city focused on the following speech as the basis for its action: " 'The Centurion!' is the only watch dog available to monitor the Chief and his lackeys, because no other form of accountability exists. What does exist is a double standard, and like a malignant cancer, is [sic] continues to grow larger." In his supporting declaration, Bullerjahn declared that at least 14 issues of "The Centurion!" had circulated within the police department between October of 1987 and January of 1989, but that no individual took responsibility for any of the issues except for the December 21, 1988, issue. The past issues were submitted as exhibits. He also stated that the edition was posted in a lounge area which was accessible to both department personnel and to members of the public and that he perceived the reference to Moore's superiors as " 'lackeys' as a direct attempt to undermine my authority as well as the authority of the officers to whom . . . Moore referred. Furthermore, I have no doubt that the posting and circulation of this and other issues of 'The Centurion!' have interfered with close working relationships within the department."

The court granted the petition and ordered the issuance of the peremptory writ removing the letter of reprimand from Moore's file. It based its ruling on First Amendment grounds and did not address whether the city's actions violated the Meyers-Milias-Brown Act, Government Code section 3500 et

seq.[4] The court found that "[t]he edition of 'The Centurion!' complained of by the [city] contains insulting, and juvenile attacks on co-workers and the Chief of Police. Such attacks contribute little to reasoned discourse and give an appearance of mere personal grievance irrelevant to the public's evaluation of the performance of the Police Department. [¶] However, on balance, 'The Centurion!' issue concerns the relationship of the members of the Police Officer's Association to their employer. It is undisputed that the views expressed in 'The Centurion!' were often disseminated to local and state officials and the news media. In addition, 'The Centurion!' was posted in a place accessible to the public. Subject matter included employer-employee relationships, officer safety, the competency of the police force and other matters which are related to the employer's efficient performance of its duties. As such, the speech in question substantially involves matters of public concern and is protected under the First Amendment to the U.S. Constitution."

Judgment was entered for respondents and this appeal followed.

## FIRST AMENDMENT

The word "lackey" is defined as "a liveried retainer . . . a servile follower." (Webster's New Collegiate Dict. (9th ed. 1983) p. 669.) When questioned about his use of this term, Moore stated that he had no idea what it meant until someone suggested he look it up in the dictionary. The dictionary "said 'a follower of orders.' It also said 'often following orders without question.' In my role as Association president, it seemed appropriate that there are times, when I think that Management does follow orders without question." Although he did not know if it was meant to be derogatory, Moore conceded that "[i]t certainly wasn't flattering. [¶] . . . It might describe the status quo."

■ "It is now well settled that public employees enjoy the full protection of the First Amendment. *Keyishian v. Board of Regents,* 385 U.S. 589, 87

[4]This act is designed "to promote full communication between public employers and their employees by providing a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment between public employers and public employee organizations . . . [and to] provid[e] a uniform basis for recognizing the right of public employees to join organizations of their own choice and be represented by such organizations in their employment relationships with public agencies. . . ." (Gov. Code, § 3500.) Respondents alleged below, as they do here, that Moore's discipline violated Government Code section 3502, which guarantees public employees the right "to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations" and Government Code section 3506, which prohibits interference with the exercise of these rights. Because we affirm the ruling on First Amendment grounds, we do not address these claims.

S.Ct. 675, 17 L.Ed.2d 629 (1967); *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967)." (*Hanneman v. Breier* (7th Cir. 1976) 528 F.2d 750, 752.) The Supreme Court has recognized that "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." (*Garrity, supra,* 385 U.S. at p. 500 [17 L.Ed.2d at p. 567].)

There is no general standard against which all critical statements by public employees against their employers may be judged. In *Pickering* v. *Board of Education* (1968) 391 U.S. 563, 568 [20 L.Ed.2d 811, 88 S.Ct. 1731], the court recognized that such a rule would be infeasible due to the enormous variety of factual situations in which such comments arise. It did, however, provide the basic guidelines for analysis which are used today. The determination of whether a public employer has properly disciplined or discharged an employee for engaging in speech requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." (*Pickering, supra,* 391 U.S. at p. 568 [20 L.Ed.2d at p. 817]; *Connick* v. *Myers* (1983) 461 U.S. 138, 140 [75 L.Ed.2d 708, 716, 103 S.Ct. 1684]; *Rankin* v. *McPherson* (1987) 483 U.S. 378, 384 [97 L.Ed.2d 315, 324, 107 S.Ct. 2891].)

 Appellants argue that the court did not properly apply this balancing test to determine whether Moore's speech was protected for two reasons. First, they contend that it was improper for the court to rule that the derogatory language was protected solely because speech in other parts of the edition was protected. The issue should be the specific derogatory statements and not "The Centurion!" as a whole. Second, after determining that the speech involved matters of public concern, they contend that the court failed to balance the City's interest in promoting the efficiency of its police services against Moore's interest in making the statements.

*Public Concern*:

 Since *Pickering*, the Supreme Court has refined the balancing test in one important aspect. It is now established that the threshold question before applying the balancing test is whether the employee's challenged speech may be "fairly characterized as constituting speech on a matter of public concern . . . ." (*Connick, supra,* 461 U.S. at p. 146 [75 L.Ed.2d at p. 719]; *Rankin, supra,* 483 U.S. at p. 384 [97 L.Ed.2d at p. 324].) This inquiry is a question of law, not fact. (461 U.S. at p. 148, fn. 7 [75 L.Ed.2d at p. 720].)

It is improper to presume that all matters which transpire within a government office are of public concern. In the absence of matters of public

concern, public officials are not required by the First Amendment to run their office "as a roundtable for employee complaints over internal office affairs." (*Connick, supra,* 461 U.S. at p. 149 [75 L.Ed.2d at p. 721].) "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." (*Id.* at p. 146 [75 L.Ed.2d at p. 719].) Although there is no bright line, speech relating to public concerns is to be "contrasted with speech 'as an employee upon matters only of personal interest.' (*Id.* at p. 147.)" (*Wulf* v. *City of Wichita* (10th Cir. 1989) 883 F.2d 842, 857.) ██ Explaining this distinction, the Ninth Circuit has stated that "[s]peech by public employees may be characterized as not of 'public concern' when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies. (See *Connick,* [*supra,* 461 U.S. 138].) On the other hand, speech that concerns 'issues about which information is needed or appropriate to enable the members of society' to make informed decisions about the operation of their government merits the highest degree of first amendment protection." (*McKinley* v. *City of Eloy* (9th Cir. 1983) 705 F.2d 1110, 1114 [quoting *Thornhill* v. *Alabama* (1946) 310 U.S. 88, 102 (84 L.Ed. 1093, 1102, 60 S.Ct. 736)].)

Appellant's attempt to divorce Moore's use of the term "lackeys" from the context in which it arose must be rejected. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." (*Connick, supra,* 461 U.S. at pp. 147-148 [75 L.Ed.2d at p. 720]; *Rankin, supra,* 483 U.S. at p. 384 [97 L.Ed.2d at p. 324].) Perhaps the most startling example of this obligation to consider the total context of the offending comment was provided in *Rankin.* After hearing of the attempted assassination of the President, a clerical employee in a county constable's office remarked that "if they go for him again, I hope they get him." The statement was made in the course of a conversation addressing the policies of the President's administration. The court noted that a "public employer may not divorce a statement made by an employee from its context by requiring the employee to repeat the statement, and use that statement standing alone as the basis for a discharge." (483 U.S. at p. 386, fn. 10 [97 L.Ed.2d at pp. 325-326].) It held that, considered in context, the statement clearly dealt with a matter of public concern.

It is true that where individual items of speech are severable, the court may determine that some, but not all, of them address matters of public concern. That particular items of speech may be considered individually,

however, does not negate the responsibility to view them in their context, as revealed by the whole record. For example, in *Connick*, an assistant district attorney who was being transferred against her will wrote and circulated a questionnaire to fellow staff attorneys. The court determined that, with one exception,[5] the questions posed by the employee—which related to the degree of confidence held in supervisors, office morale, need for a grievance committee—were "mere extensions" of her personal dispute. Viewed in context, these questions were determined not to be of public concern because the employee did not seek to inform the public that the office was not properly discharging its duties or to bring to light actual or potential wrong-doing or breach of public trust by the district attorney or others. At most, "the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo." The court noted that "[w]hile discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of Myers' questions is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors. These questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celebre." (461 U.S. at p. 148 [75 L.Ed.2d at p. 721].)

■ In this case, Moore's use of the term "lackeys" must be viewed in the larger context of both the edition as a whole and of the climate then existing between Moore, the Association and the police department. A key aspect of this broader context is the fact that, at all relevant times, "the Association and . . . Moore, as president of The Association, were involved in protracted negotiations with the City regarding a memorandum of under-standing[6] covering the law enforcement bargaining unit." During this same period (Oct. 1987 to Jan. 1989), at least 14 editions of "The Centurion!" were circulated within the police department. It is clear that the Association purposefully addressed its comments, not only to its internal membership, but to the general public. Copies of various editions of "The Centurion!", including the one at issue, were sent to the Chico News and Review. Copies were also posted on the bulletin board which was accessible to the public. In allowing the use of these boards, the department must have realized that information and perhaps criticism relating to conditions of employment would be visible to the public.

---

[5]The question of whether employees felt pressured to work on political campaigns on behalf of office-supported candidates was determined to be a matter of public concern, to which the court applied the balancing test. (*Connick, supra*, 461 U.S. at p. 149 [75 L.Ed.2d at p. 721].)

[6]"If agreement is reached by the representatives of the public agency and a recognized employee organization . . . , they shall jointly prepare a written memorandum of such understanding, which shall not be binding, and present it to the governing body or its statutory representative for determination." (Gov. Code, § 3505.1.)

The editorial context of Moore's speech in this particular edition of "The Centurion!," as summarized by the trial court, concerned the relationship of the members of the Association to their employer. Its subject matter "included employer-employee relationships, officer safety, the competency of the police force and other matters which are related to the employer's efficient performance of its duties." The statement at issue was sandwiched between complaints about mismanagement as reflected by double standards in the enforcement of departmental regulations and a reminder that "the chief is standing between you and a contract." Viewed in context, the speech related to both the desire for the benefits of unionization and the loss of confidence in the management of the department. Both of these topics have been determined to be matters of public concern.

■ "The urge to unionize certainly falls within the category of expression that is 'fairly considered as relating to any matter of political, social, or other concern to the community. . . .' (*Connick, supra,* 461 U.S. at p. 146, . . .)" (*A.P.W.U.* v. *U.S. Postal Service,* (D.C.Cir. 1987) 830 F.2d 294, 301.)[7] This public concern encompasses other matters which, viewed in context, are generally related to it. For example, in *A.P.W.U,* a postal worker's column in a union newsletter which addressed efforts to combat threats to organized labor from a "right to work" petition was held to be a public concern. In the column, the employee had written that he learned of the petition by reading a bulk mail letter from a congressman while processing third class mail. He later retracted his description of how he learned of the petition, explaining that it was only a literary device. The court refused to isolate the discussion of the contents of this letter from its editorial context —i.e., the substantive discussion of the "right to work" issue. It held that the speech for which the employee was discharged was "inextricably bound up" with speech on a matter of public concern. (*Id.* at p. 302.) The alleged harm to the public employer from the employee's assertion that he disclosed third class mail is not a part of the threshold inquiry as long as the statement in context is related to the overall public concern. The governmental harm is to be considered later in the balancing test. (*Id.* at pp. 302, 303, fn. 8.)

■ The First Amendment protects not only the individual's interest in speaking out but also the public's interest in being informed. (*Hanneman,*

---

[7]Union membership is protected by the right of association guaranteed by the First and the Fourteenth Amendments. (*Thomas* v. *Collins* (1945) 323 U.S. 516 [89 L.Ed. 430, 65 S.Ct. 315].) "The right . . . to discuss, and inform people concerning the advantages and disadvantages of unions and joining them is protected not only as part of free speech, but as part of free assembly." (323 U.S. at p. 532 [89 L.Ed. at p. 441]; *Henderson* v. *Huecker* (8th Cir. 1984) 744 F.2d 640, 645-646 [adverse reemployment recommendation based on unconstitutional consideration of employee's union activities ordered expunged].)

*supra,* 528 F.2d at p. 755.) In *Hanneman,* the Milwaukee Professional Policemen's Protective Association wrote a letter to city and labor board officials confirming and protesting a confidential internal investigation into their political activity. Several police officers were disciplined for violating the department's confidentiality rule, even though news of the investigation had appeared in the local newspaper the day before the Association mailed its letter. Recognizing that "the terms of a collective bargaining agreement covering municipal police officers may include provisions governing matters of important public policy," the court concluded that the Association's letter touched on matters of public concern. (*Ibid.*)

 Speech which has generally dealt with "the working relationship between the police union and elected city officials" has been held to be of "public concern." (*McKinley, supra,* 705 F.2d at p. 1114.) In *McKinley,* a probationary police officer acting as a union representative protested the city council's decision not to give police officers an annual raise. The court noted that "the interrelationship between city management and its employees is closely connected with "discipline and morale in the workplace"—factors that "are related to an agency's efficient performance of its duties." (*Connick, supra,* 461 U.S. at p. 148 [75 L.Ed.2d at p. 721].)

The misuse of public funds, wastefulness, and inefficiency in managing and operating government entities have also been identified as matters of public concern. (*Roth* v. *Veteran's Admin. of Government of U.S.* (9th Cir. 1988) 856 F.2d 1401, 1405.) Such speech does not automatically deserve protection. Whether speech of this type rises to a level of public concern must be determined from an examination of the context of the speech, "particularly the *point* of the speech." (*Id.* at p. 1405.) Here, the point of the speech was departmental mismanagement, which fueled the desire for the benefits of a union contract. A loss of confidence in management's efficiency and discipline contributes to low morale which can in turn affect the ability of a fire or police department to fulfill its duties to protect the public safety. The ability of the department to fulfill this mandate is a matter of public concern. (See *Fire Fighters Ass'n Dist. of Columbia* v. *Barry* (D.D.C. 1990) 742 F.Supp. 1182, 1189-1190 [bumper stickers characterizing fire department as "not just a job, it's a joke, too!" held, in context of a dispute over effective management, to address a matter of public concern].) The Ninth Circuit has recognized that, in the abstract, a police officer's right to comment on matters of public concern pertaining to the operation of the department of which he is a part is "substantial because, as a member of the department, he is a person 'extraordinarily able to inform the public of deficiencies in this important governmental department.' (Cf. *Pickering, supra,* at p. 572.)" (*Kannisto* v. *City and County of San Francisco* (9th Cir. 1976) 541 F.2d 841, 843.)

The principle which emerges from these cases is that the threshold test is met when the challenged speech, viewed in context, relates to matters of public concern. Such speech does not become unprotected simply because it included a complaint which was personal to Moore. (*Biggs* v. *Village of Dupo* (7th Cir. 1990) 892 F.2d 1298, 1302.) Here, Moore's use of the term "lackeys" was substantially intertwined with both comments on employer-employee relations and allegations of mismanagement. We conclude that, taken in context, Moore's speech addressed issues of public concern. We now turn to a determination of whether the city's interests in efficiency as an employer outweigh Moore's speech interest.

*Balancing of Interests*:

"[I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." (*Pickering, supra,* 391 U.S. at p. 568 [20 L.Ed.2d at p. 817].) ■ Once it is determined that the speech addresses a matter of public concern, the court must balance the employee's interest in making the statement against the public employer's interest in promoting efficiency. This balancing also presents a legal question. (*Roth, supra,* 856 F.2d at p. 1407.)

In performing this balance, "the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." (*Rankin, supra,* 483 U.S. at p. 388 [97 L.Ed.2d at p. 327].) In addition, "pertinent considerations [are] whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. (*Pickering,* 391 U.S., at 570-573.)" (483 U.S. at p. 388 [97 L.Ed.2d at p. 327].)[8]

■ The trial court's ruling does not clearly articulate either its analysis or its conclusion on the balancing of employer-employee interests. Its focus was concentrated on the threshold issue of whether the speech related to a

---

[8]Some courts have indicated that the private aspect of an employee's expression must also be put into the balance when weighing the speaker's interest in expression against the employer's interest in regulating that expression. (*Fire Fighters, supra,* 742 F.Supp. at p. 1190.) Here, although Moore was the subject of the officer safety grievance, the cavalier manner in which a threat to kill a police officer was allegedly handled by management transcends classification of the incident as a purely personal grievance.

matter of public concern. There was no explicit mention of harm to appellants or of how their interests balanced against Moore's speech interest.

The city argues that the court failed to conduct the balancing test and weigh Moore's interest in commenting on the matter against its interests in promoting the efficiency of its police services. According to appellants, *Marshall v. City of Atlanta* (D.C.Ga. 1984) 614 F.Supp. 581, affirmed 770 F.2d 174 (11th Cir. 1985) and *Kannisto, supra,* 541 F.2d 841, compel the conclusion that the city's interests prevail on balance. Respondents in turn rely on *McKinley, supra,* 705 F.2d 1110 for the proposition that speech as a union representative on employment issues is a matter of public concern. Respondents do not address the balancing of interests and thereby incorrectly suggest that this conclusion ends our inquiry. We find both *Marshall* and *Kannisto* distinguishable, however, and hold that appellants have failed to meet their burden of demonstrating actual harm to internal discipline and efficiency as a result of this speech. We therefore find the speech to be protected.

In *Marshall, supra,* 614 F. Supp. 581, the court concluded that the fire department's interest in maintaining the authority of its officers and thus the order and harmony in the firefighting unit outweighed the employee's interest in "abrasive, offensive criticism of his superiors and/or their manner of conducting their duties." (614 F.Supp. at p. 583.) Contrary to appellants' suggestion, the speech found unprotected in *Marshall* is not substantially identical to that presented in this case. The speech at issue in *Marshall* occurred after a city firefighter had discussed a doctor's certificate with his superiors, whom he then called "goddam mother fuckers," "downtown lackeys," and "sons of bitches." This reference was apparently made in front of his coworkers. Although it is true that Moore also used the term "lackey," the language in *Marshall* was obscene and clearly different in degree from that used here. In addition, Marshall's speech arose in the context of a purely personal grievance. The court ignored the crucial threshold question of whether the speech involved a matter of public concern and proceeded immediately to the balancing of interests. Under *Connick* and unlike the situation before us, Marshall's speech did not address a matter of public concern.

In *Kannisto, supra,* 541 F.2d 841, a police lieutenant was suspended after he described his superior officer as "a most 'unreasonable, contrary, vindictive individual,' whose behavior was 'unreasonable, belligerent, arrogant, contrary and unpleasant" to his subordinates during an inspection. (*Id.* at p.

842.)[9] As previously mentioned, the court concluded that the operation of the department was a matter of public concern and that Kannisto's right to comment on it was "substantial." In balancing the competing interests, however, the court stated that the comments were directed against a superior with whom Kannisto worked in close daily contact and that a disruptive influence on discipline and harmony could be presumed because of the context in which it was delivered.

Appellants' reliance on the 1976 decision in *Kannisto* for the principle that harm to the police department's interest will be presumed from Moore's use of the term 'lackey' is outdated. After *Rankin*, it is clear that this presumption of harm is no longer appropriate. Once it has been determined that the speech addresses a matter of public concern, the burden is on the public employer to justify the discipline on legitimate grounds under the balancing test. (*Rankin, supra,* 483 U.S. at p. 388 [97 L.Ed.2d at pp. 326-327].) In *Rankin*, the court determined that the county constable failed to demonstrate a state interest that outweighed McPherson's First Amendment rights because, there was "no evidence that . . . [the statement] interfered with the efficient functioning of the office." (*Id.,* at p. 389 [97 L.Ed.2d at p. 327].)

Since this decision, the Ninth Circuit has determined that, before we can find that "the government's interest as an employer in a smoothly-running office" outweighs Moore's First Amendment right, the city "must demonstrate actual, material and substantial disruption." (*Roth, supra,* 856 F.2d at p. 1407; see also, *Gillette* v. *Delmore* (9th Cir. 1989) 886 F.2d 1194 [A.L.R. Fed. 3957] [finding genuine issues of material fact as to whether employee's speech impaired efficient and safe operation of fire department]; *A.P.W.U., supra,* 830 F.2d 294 at p. 303. fn. 12 [employee's interest prevails in absence of evidence of concrete harm]; *Fire Fighters, supra,* 742 F.Supp. at p. 1191 [harm cannot be "merely hypothetical"; testimony "that unidentified fire-fighters 'grumbled' about the message conveyed by the bumper sticker" held insufficient to show concrete harm to departmental interests].)[10] This re-

---

[9]In a footnote, the court mentioned that "[t]he department originally cited as an alternate reason for suspension the publication by Kannisto of his opinions in a newspaper of the San Francisco Police Officers Association" but that the district court held that this publication was constitutionally protected. (541 F.2d 841 fn. 1.) That ruling was apparently unreported.

[10]In deciding whether concrete harm exists, the D.C. Circuit has indicated that a court is not limited to objective evidence presented by the government, but may draw reasonable inferences from the circumstances surrounding the event. (*Hall* v. *Ford* (D.C.Cir. 1988) 856 F.2d 255.) This result was necessitated in *Hall* by the procedural posture of the case—i.e., an appeal from the dismissal of the complaint—and the fact that Hall was a "prominent policy-level official" in that class of "fragile relationship" jobs demanding exacting loyalty. As indicated by *Fire Fighters, supra,* 742 F.Supp. at page 1191, *Hall* does not do away with the "concrete harm" requirement.

quirement was intimated earlier in *Connick, supra,* where the court noted that there was "no demonstration" that the staff attorney's questionnaire impeded her ability to perform her responsibilities. Because close-working relationships with her superiors were required and there was some testimony that the questionnaire had caused a "mini-insurrection" in the office, the court struck the balance in favor of the district attorney. It cautioned, however, "that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." (461 U.S. at p. 152 [75 L.Ed.2d at p. 723].) Referring to this language, the court in *McKinley, supra,* 705 F.2d at page 1115, stated that "real, not imagined, disruption is required, and the 'close working relationship' exception cannot serve as a pretext for stifling legitimate speech or penalizing public employees for expressing unpopular views."

In this case, appellants offered no evidence of any disruptive effect occasioned by Moore's speech, other than the chief's conclusionary opinion that he perceived it as interfering with close working relationships within the department and as a direct attempt to undermine his authority and that of the officers to whom Moore referred. The absence of any evidence except such an opinion has been determined to constitute a failure of proof. (*A.P.W.U., supra,* 830 F.2d at p. 304.) Appellants "have put forth no explanation of how [Moore's] statements . . . impeded his ability to perform his job or interfered with the [department's] public responsibilities." (*Allen* v. *Scribner* (9th Cir. 1987) 812 F.2d 426, 433, mod., 828 F.2d 1445.) They have offered no evidence that Moore qualifies as a policy-level official with a special working relationship which might justify an "inference of disruption" to departmental operations. (*Fire Fighters, supra,* 742 F.Supp. at p. 1192.) As his status as both member and president of the Association indicates, Moore is "simply a rank and file public officer, not a high level official charged with administering policy." (*McKinley, supra,* 705 F.2d at p. 1115.)

On this record, it is equally probable that any disruption to efficiency and discipline in the department was the result of a widely held perception of mismanagement which was merely reflected in "The Centurion!" edition rather than precipitated by Moore's speech. As noted in *Wulf, supra,* 883 F.2d at page 861, "[t]o the extent there was controversy and disruption occasioned by the allegations relating to the [Fraternal Order of Police] FOP, those were not entirely *caused by* Wulf's letter; rather, they were a partial inspiration for Wulf's letter." Public employers cannot rely on disruption which they have instigated or exacerbated to outweigh an employee's first amendment rights. (*Roth, supra,* 856 F.2d at p. 1408.)

Finally, there is no indication that the posted edition, which was removed from the bulletin board the same day it was posted, was seen by any member

of the public. (*A.P.W.U., supra,* 830 F.2d at p. 305 [determining that, although "several of the 2,100 copies may possibly have come to the attention of nonemployees, this accidental public readership could only be small, and certainly is not to be presumed in the absence of any proof."]) In the absence of any evidence of real harm, we cannot say that the appellants' interest in discipline and efficiency outweighed Moore's speech interest. The city and its chief of police would be well served to ponder Justice Louis Brandeis' views when he stated: ■ "Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burned women. It is the function of speech to free men from the bondage of irrational fears." (*Whitney* v. *California* (1927) 274 U.S. 357, 376 [71 L.Ed. 1095, 1105 47 S.Ct. 641] (conc. opn. of Brandeis, J.).)

## DISPOSITION

The judgment is affirmed. Costs to respondents.

Blease, Acting P. J., and Nicholson, J., concurred.