Filed 11/6/24 Meinhardt v. City of Sunnyvale CA4/1
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DAVID MEINHARDT,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SUNNYVALE, SUNNYVALE PERSONNEL BOARD,<br><br>Defendant and Respondent,<br><br>SUNNYVALE DEPARTMENT OF PUBLIC SAFETY,<br><br>Real Party in Interest and Respondent. | D079451<br><br>(Super. Ct. No. 19CV346911) |

APPEAL from a judgment of the Superior Court of Santa Clara County, Peter H. Kirwan, Judge. Affirmed.

Messing Adam & Jasmine and Gregg McLean Adam; Kirkland & Ellis, Michael J. Shipley and Nathaniel Haas, for Plaintiff and Appellant.

Liebert Cassidy Whitmore, Suzanne Solomon and David A. Urban for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

The City of Sunnyvale, Sunnyvale Personnel Board (Board) disciplined David Meinhardt for a false statement in a letter he sent to members of the Sunnyvale public safety officers' union and city council. Meinhardt petitioned the superior court for a writ of administrative mandate for the Board to revoke the discipline. The court denied Meinhardt's petition. In this appeal, Meinhardt argues the city was not sufficiently harmed to justify disciplining him for his speech that was protected by the First Amendment.[1] We conclude Meinhardt's speech was only marginally related to a matter of public concern and on balance, the Board was justified in taking action. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. Events Leading To Meinhardt's Letter

The Internal Affairs (IA) Unit investigates complaints against employees of the Sunnyvale Department of Public Safety (the Department). In February 2015, the IA Lieutenant conducted an investigation into an allegation that Meinhardt was using an air horn excessively at an intersection near another public safety lieutenant's home. The IA Lieutenant asked the chief to be

---

1 We previously dismissed this appeal as untimely, holding the time to appeal ran from the date of the order denying Meinhardt's petition. (*Meinhardt v. City of Sunnyvale* (2022) 76 Cal.App.5th 43, 51–52.) The Supreme Court reversed, adopting a bright line rule that "the time to appeal in administrative mandate proceedings starts to run with entry of 'judgment' or service of notice of entry of 'judgment,' rather than with the filing of, or service of notice of the filing of, an 'order,' minute order, or other ruling." (*Meinhardt v. City of Sunnyvale* (2024) 16 Cal.5th 643, 650.) On remand, we now decide this appeal on the merits.

removed from the investigation because he was "very good friends" with the other lieutenant and was concerned about the optics of impartiality. The chief denied his request, believing he could be impartial and conduct a thorough investigation.

At the time, the IA Lieutenant also had a friendly relationship with Meinhardt. The relationship, however, soured as a result of the investigation. When the IA Lieutenant interviewed Meinhardt, Meinhardt was rude with his answers and the tension increased as the interview progressed with Meinhardt clenching his jaw, grasping the arms of his chair, and turning red. At the end of the interview, the IA Lieutenant attempted to break the tension by saying "are we okay, [Meinhardt], because it looks like you want to fucking shoot me." The IA Lieutenant acknowledged it was a bad joke, but he thought they still had a cordial and friendly relationship. Meinhardt became very agitated and yelled at the IA Lieutenant, who immediately apologized. The IA Lieutenant self-reported his comment to the chief and the chief later removed him from the investigation at Meinhardt's request. An outside investigator finished the air horn investigation in October 2016, sustaining no charges against Meinhardt.

In December 2016, the IA Lieutenant's direct supervisor asked if he would like to continue in that position for another year. The supervisor asked this around the same time every year. The IA Lieutenant had held that position for three years and told his supervisor he was ready to transfer out. Because the chief at the time was close to retirement, the IA Lieutenant's supervisor recommended that he stay in IA until the new chief started because it was a high visibility position that would allow for interaction with the new chief, which would help his promotional opportunity.

When the new chief started in January 2017, he had one-on-one meetings with all the employees in the Department. The chief met with Meinhardt to get to know him generally as well as in his capacity as union president. The meeting started normal but turned into a conversation where Meinhardt was being "very cryptic" and told the chief that some people in the Department were "basically corrupt." At a subsequent meeting, Meinhardt told the chief he felt he was "wronged" during the air horn investigation; he was highly critical of the IA process; and he said he would be upset and would "go to the press" if the chief promoted the IA Lieutenant.

The IA Lieutenant told the new chief during his one-one-one that he was ready to move out of that position. The chief was surprised he had been the IA Lieutenant for three years since the industry standard is 18 to 24 months because it is a high-stress position. The IA Lieutenant also wanted to leave for personal reasons including the illness of an out-of-state family member. The chief granted his request and named a replacement in March 2017.

That same month, the Department held a Joint Resolution Committee (JRC) meeting, the purpose of which is for union representatives and the Department's command staff to discuss issues informally. During the meeting, which Meinhardt attended as union president, the chief said he reviewed the IA investigation process and believed it was outdated and needed to be updated to current best practices. This was not an indication there was a big problem, and it was not unusual for departments to have outdated IA processes.

After the JRC meeting, the chief and Meinhardt had a private conversation. According to Meinhardt, the chief was looking for union support for the IA modernization project. He testified the chief said that an investigation into 13 IA cases revealed "errors, lies, omissions and systematic

corruption" and that the IA Lieutenant "would be removed." Meinhardt further testified the chief said he was going to wait a few weeks to avoid the impression of disciplining the IA Lieutenant. Meinhardt kept handwritten notes from this meeting, which reflected his testimony.

The chief testified he did not say any of those things to Meinhardt. He did not use the word "remove," or make any statement that could lead someone to conclude the IA Lieutenant's rotation out of the assignment was involuntary. And he did not say he was going to delay the rotation to avoid it appearing disciplinary. The chief also testified he never told Meinhardt there were "errors, lies, omissions and systemic corruption," and that it was Meinhardt who used those words when they first met.

The following month, in April 2017, union representatives met with city leaders to discuss potential resolutions to a grievance filed regarding the air horn investigation. During this meeting, Meinhardt asserted the IA Lieutenant was involuntarily removed from that position. The city manager and other city leaders clarified that the IA Lieutenant was not forced out of the IA unit and rather voluntarily wanted to change assignments.

B. Meinhardt's Letter and Discipline

Meinhardt wrote the letter that led to his discipline in August 2017. He signed it as the union president and sent it to all Department personnel, all union members, all members of the Sunnyvale City Council, and his attorney. The letter contained two pages of single-spaced text that criticized the IA modernization project, questioned the transparency regarding issues with the current IA process, raised concerns regarding the consulting firm that the city contracted with to complete the modernization, and set forth Meinhardt's lack of confidence in the chief. The discipline, however, was based on two sentences that falsely stated the IA Lieutenant was "removed" and characterized the IA

Lieutenant's change in assignment as a "removal" that "just so happened to be at the conclusion of a fairly large internal affairs investigation." After reviewing his letter, the city manager emailed Meinhardt, reminding him that she told him the IA Lieutenant requested to rotate out of the assignment and urging him to correct his misstatement, which he did not do.

The false statement in Meinhardt's letter was damaging to the IA Lieutenant's reputation in the department and his ability to lead. The IA Lieutenant testified co-workers believed what Meinhardt wrote and officers who worked under him questioned him about the letter. He repeatedly had to address the letter and explain to co-workers "at some length" that he was not forcibly removed, and why he wanted to leave the position. He testified co-workers were avoiding him and second guessing him.

The IA Lieutenant told the chief he wanted to file a complaint and that the false statement in Meinhardt's letter affected him both professionally and personally. Following an outside investigation, the city manager disciplined Meinhardt with a 44-hour unpaid suspension. Meinhardt appealed to the Board, which conducted an evidentiary hearing and upheld the suspension, finding Meinhardt violated multiple department policies.

Meinhardt filed a petition for writ of mandate asserting his letter raised issues of critical concern to the union members and the public, constituting protected speech that could not serve as a basis for disciplining him. The trial court denied his petition. In doing so, the court recognized Meinhardt's letter covered a number of criticisms about the chief, but distinguished that the discipline was based on the two sentences that created the false impression the IA Lieutenant was involuntarily removed from that position for punitive reasons. The court further found the Board's position Meinhardt knew the "removal" statement was false was supported by the evidence in the

administrative record. The court continued its analysis because all false statements do not lose all constitutional protection, stating that "[i]nstead, the recklessness of the employee and the falseness of the statement should be considered in light of the public employer's showing of actual injury to its legitimate interests." (Citing *Johnson v. Multnomah County* (9th Cir. 1995) 48 F.3d 420, 424 (*Johnson*).) While the Board did not sustain an allegation of malice, the court found that Meinhardt's statement about the IA Lieutenant's removal was both false and harmful to the reputation and authority of the IA Lieutenant as well as the department, causing disruption therein. The court entered judgment for the Board and this appeal followed.

## DISCUSSION

### A. Protected Speech Under the First Amendment

The First Amendment prohibits discipline of a public employee for criticizing his or her employer unless the employee's free speech interest is outweighed by the employer's interest in avoiding disruption. (*Pickering v. Board of Education* (1968) 391 U.S. 563, 568 (*Pickering*).)

To be afforded First Amendment protection, the employee's speech must address a matter of legitimate public concern. (*Connick v. Myers* (1983) 461 U.S. 138, 146 (*Connick*).) "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." (*Id.* at pp. 147–148.) Speech that concerns issues that require information to enable the public to make informed decisions about their government merits the highest degree of First Amendment protection. On the other hand, speech that deals with individual personnel disputes and that would be of no relevance to the public's evaluation of the governmental agency's performance is generally

not of public concern. (*Coszalter v. City of Salem* (9th Cir. 2003) 320 F.3d 968, 973–974.)

If the speech addresses a matter of public concern, we must balance the employee's interest making the statement against the interest of the government employer in the effective and efficient discharge of its public services. (*Connick*, *supra*, 461 U.S. at pp. 150–151.) Pertinent considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." (*Rankin v. McPherson* (1987) 483 U.S. 378, 388.)

The employer's "burden in justifying a particular discharge varies depending upon the nature of the employee's expression. Although such particularized balancing is difficult, the courts must reach the most appropriate possible balance of the competing interests." (*Connick*, *supra*, 461 U.S. at p. 150.)

B. Standard of Review

Generally, the trial court's resolution of disputed factual issues is reviewed for substantial evidence. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 983.) However, where an issue implicates the First Amendment, the trial court's resolution of "constitutionally relevant facts" is subject to independent review. (See *In re George T.* (2004) 33 Cal.4th 620, 631–634 (*In re George T.*).) The reviewing court must make an independent examination of the whole record to ensure the judgment does not constitute a forbidden intrusion on free expression. (*Id.* at p. 631.) This "is necessary 'because the reaches of the First Amendment are ultimately defined by facts it is held to embrace' and an appellate court must decide 'whether a given course

of conduct falls on the near or far side of the line of constitutional protection.' " (*Id.* at p. 632.) Thus, we employ the independent review standard in determining whether speech characterized by a government entity as unprotected is in fact outside the scope of the right to free speech. (*Id.* at p. 633.)

Independent review is not the equivalent of de novo review. "Because the trier of fact is in a superior position to observe the demeanor of witnesses, credibility determinations are not subject to independent review, nor are findings of fact that are not relevant to the First Amendment issue." (*In re George T.*, *supra*, 33 Cal.4th at p. 634.) We would thus defer to the trial court's credibility determinations while making an independent examination of the whole record to determine whether Meinhardt's speech was entitled to First Amendment protection. However, because the trial court here did not hear any testimony and considered only the administrative record that we review, independent review in this case is the equivalent of de novo review. (See *People v. Jackson* (2005) 128 Cal.App.4th 1009, 1021.)

C. Analysis

Meinhardt argues the trial court made the following three errors in denying his writ petition: (1) improperly carved out the two sentences regarding the IA Lieutenant's removal and "analyzed them adrift from the context of the rest of the letter;" (2) disregarded the Board's finding that he "neither lied nor acted with malice" when it instead concluded he " 'lied' when he used the word 'removed' and this took the speech outside First Amendment protection"; and (3) ruled the department was sufficiently harmed by his false statements "primarily because they caused embarrassment to the IA [L]ieutenant." We address these claims in turn, reviewing the administrative record independently with no deference to the trial court's findings.

1.

First, in determining whether Meinhardt's speech addressed a matter of public concern, it is not clear the court considered the two sentences about the IA Lieutenant's removal separate from the remainder of the letter. The court acknowledged Meinhardt's argument that the statement in those two sentences were tied to the union criticizing the chief's management of the IA unit and were thus related to matters of public concern. Nonetheless, to be clear, in our independent review we are not considering the two sentences in a vacuum.

In *Chico Police Officers' Assn. v. City of Chico* (1991) 232 Cal.App.3d 635 (*Chico*), the Court of Appeal rejected the employer's attempt to divorce the employee's use of a derogatory term from the context in which it arose within the entire publication that otherwise addressed matters of public concern. (*Id.* at pp. 644, 646.) Meinhardt urges his letter as a whole addressed matters of public concern in "challenging inefficiencies in the department and specifically the deep-rooted problems in the internal affairs division." Relying on *Chico*, Meinhardt argues "reassignment of the [IA] [L]ieutenant—whether voluntarily or involuntarily—fit squarely within the union's theme that the internal affairs division had serious problems." We conclude that considering the entire content of the letter, the two sentences regarding the IA Lieutenant's removal touched on a matter of public concern but only marginally.

"In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." (*Johnson*, *supra*, 48 F.3d at p. 425.) While Meinhardt did not publish the letter to the press or general

public and there is evidence Meinhardt made the false statement because he had a grudge against the IA Lieutenant, we decline to resolve this case on the basis that the statement did not address a matter of public concern and instead decide it upon the *Pickering* balancing test, as did the court below.

2.

Regarding his interest in making the statement, Meinhardt's second argument is that the court erred in disregarding the Board's finding that he did not lie when the court instead found he lied in using the word "removed" and concluded this took his speech outside First Amendment protection. As an initial matter, while the Board did not sustain a charge of Meinhardt "[b]eing untruthful or knowingly making false, misleading or malicious statements that are reasonably calculated to harm the reputation, authority or official standing of this department or its members," it *did* sustain a charge of "[m]aking false statements to any supervisor or fellow employee unless specifically directed by the Chief as part of a departmental investigation."

More importantly, based on our independent review, the weight of the evidence supports a finding that Meinhardt's statement that the IA Lieutenant was "removed" was recklessly—if not knowingly—false. On one hand, Meinhardt testified the chief told him the IA Lieutenant was removed, and produced his own handwritten notes from that meeting. On the other hand, when asked if he ever said this to Meinhardt, the chief testified "absolutely not." Additionally, the city manager testified that when Meinhardt asserted at a subsequent meeting that the IA Lieutenant was involuntarily removed, the city manager made clear the IA Lieutenant requested to change assignments.

Meinhardt's second argument also fails because the court did not conclude that the falsehood of his statement took it outside First Amendment protection. To the contrary, citing *Johnson*, the court recognized that a

statement was recklessly false does not end the analysis. Instead, the falseness of a statement and the recklessness of the employee in making the statement are relevant factors in determining the level of protection afforded such statement. (*Johnson*, *supra*, 48 F.3d at p. 424.) Meinhardt's First Amendment interest in the false statement also decreases because of the context surrounding it—Meinhardt's personal dispute and animosity toward the IA Lieutenant. (See *Connick*, *supra*, 461 U.S. at pp. 153–154.)

3.

Regarding the city's interest in avoiding disruption, Meinhardt's final argument is that the trial court ruled the department was sufficiently harmed by his false statement "primarily because [it] caused embarrassment to the IA [L]ieutenant." This is a mischaracterization of the court's finding and the evidence. As the court noted, the IA Lieutenant testified he frequently had to spend time explaining to those who questioned him, including subordinates, that he was not removed involuntarily. He had to address not just rumors, but the letter specifically.

This is unlike in *Chico*, where the employer "offered no evidence of any disruptive effect occasioned by [the employee's] speech, other than the chief's conclusionary *opinion* that he perceived it as interfering with close working relationships within the department." (*Chico*, *supra*, 232 Cal.App.3d at p. 651, italics added.) The IA Lieutenant did not merely subjectively believe that Meinhardt's false statements disrupted his working relationships; he testified to the identifiable disruptions.

"[A] stronger showing may be necessary if the employee's speech more substantially involves matters of public concern." (*Connick*, *supra*, 461 U.S. at p. 152.) On balance, the limited First Amendment interest here is outweighed

by the city's interest in avoiding disruption. The Board therefore did not offend the First Amendment in disciplining Meinhardt.

## DISPOSITION

The judgment is affirmed. The Board is entitled to its costs on appeal.

O'ROURKE, Acting P. J.

WE CONCUR:

IRION, J.

CASTILLO, J.