742 A.2d 619 (1999)
327 N.J. Super. 59
Samuel DAVIS, Jr., Darryl Beard Gregory Sanders, Alvin Smith, Paul Sinckler, Arnie Abram, Michael Travis, James Smith, John Perry, Roger Lee Johnson, Yusuf El-Amin, Victor Cooper and William Sweeney, Plaintiffs,
v.
NEW JERSEY DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF STATE POLICE, Defendant.
Superior Court of New Jersey, Law Division,Mercer County.
Argued June 9, 1999
Decided July 7, 1999.
*621 Renee Steinhagen and Lowenstein Sandler, P.C., attorneys for plaintiffs, (David L. Harris, and Andrea Schwartz, appearing).
DeCotiis, Fitzpatrick & Gluck, attorneys for defendant, (Michael R. Cole, and R. Brian McLaughlin, appearing).
*620 PARRILLO, P.J.Ch.
At issue is the constitutionality of executive agency policy embodied in Art. XIII, Section 19 of the New Jersey State Police ("Division" or "State Police") Rules and Regulations (Regulation 19). That policy regulates the manner in which members of the State Police disclose information or disseminate documents to the public on matters concerning the Division and its operations, policies and practices by requiring prior approval of the agency. Plaintiffs claim such administrative regulation mandating clearance and pre-approval is overbroad and imposes a prior restraint on speech in violation of the First and Fourteenth Amendments to the United States Constitution and art. I, ¶ 6 of the New Jersey State Constitution. They seek declaratory and injunctive relief prohibiting enforcement of the policy to the extent it applies to State Police members who, like themselves, wish to speak in their private capacities about non-confidential matters of public concern.
Plaintiffs move for a preliminary injunction preventing defendant from enforcing Regulation 19 during the pendency of their underlying action which now includes federal and state claims, under 42 U.S.C. § 1983 and the New Jersey Constitution, *622 necessary to challenge the constitutionality of Regulation 19. Because, as set forth below, plaintiffs have demonstrated irreparable harm, a settled legal right and a likelihood of success on the merits of so much of their claim as pertains to speech rather than conduct, their motion for a preliminary injunction is granted in part.
I. BACKGROUND
The facts are not really in dispute and the parties have agreed this matter may be determined on the state of the record developed to date, and as a matter of law.[1] Briefly, by way of background, plaintiffs are 13 black State Police troopers who brought this action on June 11, 1997 pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e-1 et seq., the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 et seq., the New Jersey Constitution, and the New Jersey Conscientious Employee Act, N.J.S.A. 34:19-3(a), alleging racial discrimination, harassment and retaliation in the terms and conditions of their employment.[2] Earlier, in 1993, several of the plaintiffs filed a class wide charge of racial discrimination with the Equal Employment Opportunity Commission ("EEOC") against the State Police and three months later, on July 27, 1993, testified before a Congressional subcommittee as to the basis for those charges.
Since then, plaintiffs have received several requests from local and national news media to be interviewed directly about their allegations of racial discrimination and harassment. More recently, there have been media requests for interviews with plaintiffs concerning, particularly, the relationship of their allegations to current complaints of racial profiling[3] against the State Police. Specific requests have been made by news reporters for a copy of the "Special Report" related to racial profiling prepared by plaintiff James Smith which was referenced in plaintiffs' Complaint.
Plaintiffs are desirous of responding to press and other requests to speak specifically about the allegations of racial discrimination, harassment and retaliation that they have asserted in this action and generally about civil rights concerns over State Police policies and procedures which they say include racial profiling. However because they cannot do so without disclosing information obtained in the course of official duty and not otherwise generally available to the public, they are prohibited from such public discourse without first securing permission from appropriate State Police authority. On this score, Regulation 19 states in pertinent part:
A member shall:
a. Not willfully disclose to any person, whether or not for pecuniary gain, any information not generally available *623 to members of the public which such member receives or acquires in the course of and by reason of official duty, unless specifically authorized by competent Division authority.
b. Treat as confidential, unless the contrary is specifically authorized by competent Division authority, any matters or information which pertain to the Division, its operations, investigations or internal procedures.
c. Not disseminate, distribute or supply to any unauthorized member or any other person, an original, copy or abstract of any Division document, unless specifically authorized by competent Division authority.
By its terms, Regulation 19 applies to all members of the State Police, whether acting in an official or non-official capacity. It also treats as "confidential" all matters and information pertaining to the agency unless otherwise "specifically authorized" by competent agency authority.
Plaintiffs do not attack the full breadth of Regulation 19. They challenge the policy only to the extent that it regulates speech by State Police members acting in a "non-official capacity," that is, speaking as private citizens rather than as representatives of the agency. Defendant's power to regulate the "official" speech of its employeesfor example, statements made on behalf of the agency or while on dutyis therefore not in issue in this case. Similarly, the policy is challenged here only insofar as it governs speech, not conduct. Thus, despite their claim, plaintiffs present no ripe issue concerning agency documents since they never directly requested permission to disseminate same. In any event, State Police policy properly regulates only those materials not otherwise available to the public by law and plaintiffs expressly disavow any interest in releasing confidential information.[4]
Two other considerations further limit the scope of plaintiffs' challenge. First, the policy is contested only insofar as it governs speech on "matters of public concern" and not its regulation of speech about purely personal matters or individual personnel disputes and grievances. Second, plaintiffs do not question the agency's legitimate interest in regulating the flow of confidential information and plaintiffs represent they have no intention of speaking publicly about matters deemed "confidential" pursuant to statute or regulation, other than, of course, Regulation 19(b) whose constitutionality they are contesting herein. This litigation, therefore, challenges the State Police's regulation of the manner in which its members, acting as private citizens, may speak publicly about non-confidential matters of public concern relating to the agency.
It is undisputed that Regulation 19 is mandatory, currently in force and applicable to plaintiffs. Indeed, this policy has been applied to plaintiffs so as to have effectively denied them the opportunity to respond to press and other inquiries and to publicly voice their civil rights concerns with the State Police without risk of discipline. In this regard, there is no question but that State Police employees violating this rule are subject to disciplinary action.
In late February and early March 1999, plaintiffs individually filed written requests, through their respective chains of command, for "permission to give interviews to various major news media including but not limited to World News Tonight and 60 Minutes ... in reference to [their] pending litigation against the Division of State Police and The Department of Law and Public Safety."[5] As these requests *624 make clear, each wishes to be heard in a public forum on issues of public concern. To date no response has been received and defendant concedes this is tantamount to a flat-out denial of plaintiffs' requests. As a result, plaintiffs have not spoken publicly about their civil rights concerns for fear of discipline and reprisals.
II. DISCUSSION
As a consequence of agency denial, plaintiffs claim they are suffering irreparable injury in the absence of an injunction. Injunctive relief is an extraordinary remedy. To justify its award, plaintiffs must demonstrate a well-settled legal right, the deprivation of which will cause real and substantial harm. Crowe v. De Gioia, 90 N.J. 126, 132, 447 A.2d 173 (1982). They must also show that, as evidenced by the lack of a substantial dispute concerning the material facts necessary to establish their case, plaintiffs have a reasonable probability of succeeding on the merits of their claim and that the balance of relative hardships tips decidedly in their way. Id. This, they have done.
A. IRREPARABLE INJURY AND SETTLED LEGAL RIGHT
Plaintiffs' interests, as citizens, in commenting on matters of public concern go to the core of freedoms protected by the First Amendment. Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957); Garrison v. Louisiana, 379 U.S. 64, 74-75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964).[6] And, they do not relinquish their First Amendment rights simply by accepting employment with the government. Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Here, the challenged mandatory policy regulates employee speech concerning agency policies and practices and, as defendant readily acknowledges, "operates to prevent [plaintiffs] ... from speaking to the media about this litigation except at the risk of discipline." Dfs. Br. at p. 2. This is sufficient in itself to give rise to a finding of irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (plurality); Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir.1984); New Alliance Party v. Dinkins, 743 F.Supp. 1055, 1063 (S.D.N.Y.1990). Such injury may arise where free speech is "either threatened or in fact being impaired at the time the relief [is] sought." Elrod, 427 U.S. at 373, 96 S.Ct. at 2690; see also, O'Brien v. Caledonia, 748 F.2d 403, 409 (7th Cir.1984). As actually applied, the relevant harm in this case arises from the fact that plaintiffs' requests to speak have effectively been denied pursuant to Regulation 19. On its face, the relevant harm comes from Regulation 19's requirements (in sections (a) and (b)) of advance notice and pre-approval under a threat of professional discipline which, as more fully discussed below, raise the danger of self censorship among State Police employees and thus threaten their exercise of First Amendment rights. See, AM. Postal W.U., AFL-CIO v. U.S. Postal Service, 766 F.2d 715, 722 (2d Cir.1985) cert. den. 475 U.S. 1046, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986) (citing Laird v. Tatum, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 2325-26, 33 L.Ed.2d 154 (1972)); Trotman v. Board of Trustees of Lincoln University, 635 F.2d 216, 226 (3d Cir.1980). This constitutes a "specific present objective harm" to their First Amendment rights. Id.
*625 B. LIKELIHOOD OF SUCCESS ON THE MERITS
Plaintiffs have also demonstrated that they are likely to succeed on the merits of their claims at trial because they have established that Regulation 19(a) and (b) imposes a prior restraint on their freedom of speech and the government is unlikely to meet its burden of justifying that restraint. See, Harman v. City of NewYork, 140 F.3d 111, 119-21 (2d Cir.1998); Spain v. City of Mansfield, 915 F.Supp. 919 (N.D.Ohio 1996). Cf., Latino Officers Ass'n. v. Safir, 170 F.3d 167 (2d Cir.1999).
(i) The Pickering Balancing Test
To be sure, government employees do not enjoy the same freedom of speech as members of the general public. Indeed, government has a special authority to proscribe speech of its employees. Harman, supra; Weaver v. United States Information Agency, 87 F.3d 1429, 1440 (D.C.Cir.1996), cert. den. 520 U.S. 1251, 117 S.Ct. 2407, 138 L.Ed.2d 174 (1997). "It cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Pickering v. Bd. of Education, supra, 391 U.S. at 568, 88 S.Ct. at 1734. Indeed, government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." United States v. National Treasury Employees Union, 513 U.S. 454, 465, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995) ("NTEU"), see also, Waters v. Churchill, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).
In the exercise of such governmental authority, vigilance is necessary to ensure that public employers do not use their power over employees to silence discourse, "not because it hampers public functions but simply because superiors disagree with the content of employees' speech." Harman v. City of New York, supra, 140 F.3d at 119. Thus, in mediating the tension between the conflicting interests of public employees and employers, and in assessing the constitutionality of governmental restraints on employee speech, a court must "arrive at a balance between the interests of the [employee] as a citizen, in commenting on matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it perform's through its employees." Pickering v. Bd. of Education, supra, 391 U.S. at 568, 88 S.Ct. at 1734-35. The government bears a particularly heavy burden in this balancing test where, as here, the issue is not a single disciplinary action taken against an individual employee, but rather a regulation which prospectively burdens a broad category of speech by a large number of potential speakers, i.e., a ban that "chills potential speech before it happens." NTEU, supra, 513 U.S. at 468, 115 S.Ct. at 1014. When such a regulation is challenged, "[t]he government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's `necessary impact on the actual operation' of the government." Id.; citing Pickering, 391 U.S. at 571, 88 S.Ct. at 1736.[7]
*626 Application of the Pickering/NTEU test involves a two-step process. The court's threshold inquiry is whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern. Pickering, supra, 391 U.S. at 568, 88 S.Ct. at 1731. Only when the speech is determined to be of "public concern" and therefore constitutionally protected, will the court engage in balancing and inquire into whether the interests of the employees and the public, on the one hand, are outweighed by those of the government, on the other. Id. See, Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689-90, 75 L.Ed.2d 708 (1983).
(ii) Matters of Public Concern
Speech on public issues traditionally has occupied "the highest rung of the hierarchy of First Amendment values." Connick v. Myers, supra, 461 U.S. at 145, 103 S.Ct. at 1689 (citing NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982)). See also, McKinley v. City of Eloy, 705 F.2d 1110, 1114 (9th Cir.1983); Chico Police Officers' Ass'n. v. City of Chico, 232 Cal.App.3d 635, 283 Cal.Rptr. 610, 615 (Cal.Ct.App.1991). Of course, speech relating to public concerns is to be contrasted with speech as an employee upon matters only of personal interest. Connick v. Myers, supra, 461 U.S. at 147, 103 S.Ct. at 1690. After all, the First Amendment "does not require a public office to be run as a roundtable for employee complaints over internal office affairs," such as a change in duties, or other personnel disputes and grievances. Id. On the other hand, informed discussion of government's internal operations, policies and practices is "perhaps the paradigmatic matter [ ] of public concern." Sanjour v. Environmental Protection Agency, 56 F.3d 85, 91 (D.C.Cir.1995) (en banc).
In Pickering, a high school teacher was fired for writing a letter to a newspaper. The letter criticized the school board's allocation of funds between educational and athletic programs and the board's methods of informing the taxpayers of the need for additional revenues. The Supreme Court held that the letter clearly involved matters of public interest first, because it stated an opinion regarding the `preferable manner of operating the school system,' and second, because the letter raised questions upon which `free and open debate is vital to informed decision-making by the electorate.' See also, Spain v. City of Mansfield, supra, (fire fighter's concerns about city's proposal to combine police and fire dispatch as well as use of emergency medical services were matters of public concern for purposes of determining whether the fire fighter's speech was protected.), Czurlanis v. Albanese, 721 F.2d 98, 104 (3d Cir.1983) (a public employee spoke on matters of public concern when he sought to bring to light actual or potential wrongdoing or breach of the public trust by certain public officials .); Kannisto v. City and County of San Francisco, 541 F.2d 841, 843 (9th Cir.1976) (a police officer's right to comment on matters of public concern pertaining to the operation of the department of which he is a part is "substantial because, as a member of the department, he is a person extraordinarily able to inform the public of deficiencies in this important governmental department.").
In evaluating the content of the speech, courts have recognized certain subjects, such as racial discrimination, as inherently of public concern. For example, in Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir.1988), plaintiff, a civilian clerical employee, was interviewed by a news reporter during non-work hours about alleged racial discrimination within the Pennsylvania State Police and a resulting news article appeared, *627 critical of the police agency. The court held that the plaintiff's claims were matters of "grave public concern," as evidenced by the news reporter's initiative in contacting Rode, and especially in light of the prior protracted history of litigation against the Pennsylvania State Police charging it with racial animus in its employment practices and in view of the hearings conducted by the state legislature to determine the extent of racial discrimination in that agency.
Similarly, in Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Court held that a public school teacher's private comments to the school principal charging racially discriminatory policies and practices within the district were public expression warranting protection under Pickering. Id. at 412-15, 99 S.Ct. at 694-96. The Connick Court characterized Givhan's allegations of racial discrimination as "a matter inherently of public concern." Connick, 461 U.S. at 148 n. 8, 103 S.Ct. at 1690-91 n. 8.
Here the challenged rule regulates employee speech concerning the policies and activities of the New Jersey State Police, the largest law enforcement agency in this State. Plaintiffs want to speak about problems of racial discrimination, harassment and retaliation which they say exist within their organization and which underlie their complaint in this action, as well as the relationship of these practices to recent allegations of racial profiling by certain of its members. The latter has been the subject of intense media coverage of late[8] as well as executive, legislative and judicial review and oversight. Despite official findings, there is an ongoing public debate about the origin, nature and extent of the practice of racial profiling within the State Police and the remedies needed for its elimination. Plaintiffs desire to contribute to the public debate as they may be "in the best position to know what ails the agenc[y] for which they work; public debate may gain much from their informed opinions." Waters v. Churchill, 511 U.S. 661, 674, 114 S.Ct. 1878, 1887, 128 L.Ed.2d 686 (1994) (plurality opinion); see also, Sanjour, supra, 56 F.3d at 94; Harman, supra, 140 F.3d at 119. That they may have a personal stake in the controversy renders the issues which plaintiffs wish to raise no less substantial or the debate no less public. Rode v. Dellarciprete, supra, at 1202.
Plaintiffs' proposed speech, to the extent it seeks to voice civil rights concerns over certain practices and activities of the State Police, is of considerable importance to the public. Yet this sort of commentary, to the extent it relies on information acquired by plaintiffs "in the course and by reason of official duty" falls squarely within the purview of the challenged policies. The point need not be belabored: this speech is obviously of interest to the public whom the agency serves. Indeed plaintiffs' challenge is limited to the agency's regulation of speech "on matters of public concern" and defendant acknowledges plaintiffs' proposed speech qualifies as such. Dfs. br. at p. 15.
As noted, the determination that plaintiffs' comments constitute matters of public concern does not end the inquiry. Their exercise of this right must be balanced against the right of their employer to promote the efficiency of the public services it renders through its employees. Pickering v. Bd. of Education, supra, 391 U.S. at 568, 88 S.Ct. at 1731. In performing this balance of employer/employee interests, the government bears the burden of justifying any adverse employment action and that its challenged policies are necessary to the efficient operation of the *628 agency. See, Rankin v. McPherson, 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987); Harman, supra, 140 F.3d at 117-18.
(iii) Employees' Interest
Weighing in on the employees' side of the balance are not only the interests of "present and future employees in a broad range of present and future expression ... but also the interests of their potential audiences ... in receiving the speech suppressed." Sanjour, supra, 56 F.3d at 94. These interests are substantial. Harman, supra, 140 F.3d at 118; Kannisto v. City of San Francisco, 541 F.2d 841, 842 (9th Cir.1976). Our constitutional heritage places paramount value on robust discussion and criticism of government. By virtue of their experience and specialized knowledge, plaintiffs are among the citizens best informed about the workings of the State Police and their opinions of workplace affairs are especially valuable to the public.
More to the point, plaintiffs' interest in expression is even broader than their interest in promoting civic virtue. Separate and apart from a purely instrumental interest in informing the public, there is the personal value of expression to the individual public employee. This interest in self expression is linked indissolubly with the purposes of the First Amendment. Here, plaintiffs' interest is in the unfettered dissemination of their views regarding the effectiveness of the State Police, unfiltered by a prior review and approval process. Such speech is "the essence of self-government." (Garrison v. Louisiana, 379 U.S. 64, 74-75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964)).
(iv) The Public's Interest
By the same token, the public has a vital interest in informed discussion of governmental affairs. In Pickering, which concerned a teacher's published complaints about the school board's allocation of funds, the Court stated:
On such a question free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.
Pickering, 391 U.S. at 571-72, 88 S.Ct. at 1736.
Likewise, in this case, the public interest in free and open debate about State Police operations is manifestly great. Sanjour, supra, 56 F.3d at 94; Gasparinetti v. Kerr, 568 F.2d 311, 317 n. 18 (3d Cir.1977). As the Court in Gasparinetti noted: "(I)t is important that the public have access to the thoughts and expressions of the rank and file police officers, whose views as to the effectiveness of police policy may be quite valuable to the community." Id. Most significantly, plaintiffs' intended comments will attempt to draw a connection between their allegations of discriminatory law enforcement tactics directly affecting the general populace and equally offensive employment practices directly impacting members of the State Police. Undeniably, the public has an intense interest in eradicating discrimination both within and outside the workplace. Payton v. New Jersey Turnpike Authority, 148 N.J. 524, 548, 691 A.2d 321 (1997); Dixon v. Rutgers State University of N.J., 110 N.J. 432, 450, 541 A.2d 1046 (1988).
(v) The Detriments of Prior Restraints
Plaintiffs' asserted interest, therefore, is to speak publicly about their civil rights concerns with certain State Police practices and activities without first complying with the notice and approval requirements mandated by Regulation 19.[9] These before-the-fact review and approval *629 requirements restrict employee speechand raise special concerns such as undue delay and stifling of expression that in hindsight may be viewed as harmless or not worth the enforcement effort. See, Freedman v. Maryland, 380 U.S. 51, 59, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965). As applied to these plaintiffs, they have operated to flatly prohibit their public speech. On their face, these restrictions are likely to chill, prospectively, the public speech of plaintiffs as well as other State Police employees.
Under Regulation 19(a) and (b), State Police superiors have the authority to prohibit the public speech of their subordinates altogether, as they have done here by effectively denying plaintiffs' formal written requests to speak. Likewise, State Police supervisors may decide which employees may speak publicly, when they may speak and the content of their speech. Regulation 19(a) and (b) allows State Police officials to determine what kind of speech will harm agency operations instead of punishing disruptive remarks after their effect has been felt. By suppressing speech before it takes place, State Police administrators may prevent speech that would not actually have had a disruptive effect. See, e.g., NTEU, supra, 513 U.S. at 475 n. 21, 115 S.Ct. at 1017 n. 21; Harman, supra, 140 F.3d at 121.
This policy directly regulates speech. And in doing so, it fails to include "narrow, objective and definite standards" by which consent to speak will be granted or denied. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). By placing "unbridled discretion in the hands of a governmental official," City of Lakewood v. Plain Dealer Pub., 486 U.S. 750, 757, 108 S.Ct. 2138, 2144, 100 L.Ed.2d 771 (1988), Regulation 19(a) and (b) raises the specter of content and viewpoint censorship. Latino Officers Ass'n. v. Safir, 1997 WL 426099 (S.D.N.Y.1997), vacated on other grounds 170 F.3d 167 (2d Cir.1999).
Moreover, the prior approval mechanism of Regulation 19(a) allows the agency to control the timing of the intended speech. Regulation 19(a) contains no temporal constraints within which State Police supervisors must respond to a subordinate's request to speak publicly. "By delaying the review process, the employer has the power to destroy the immediacy of the comment on agency affairs, and thus, in many cases, its news worthiness." Harman, supra 140 F.3d at 120. In such cases, "dissemination delayed may prove tantamount to dissemination denied." Laurence H. Tribe, American Constitutional Law 1042 (2d Ed.1988).
"Regulations [such as Regulation 19], which condition the exercise of speech rights on the prior permission of a government official, constitute a prior restraint." Fire Fighters Assoc., District of Columbia v. Barry, 742 F.Supp. 1182, 1194 (D.D.C. 1990). The existence of the approval requirement is itself likely to chill the public speech of State Police employees before it happens. In the first place, an officer who has been denied permission to speak, as plaintiffs here have been, may be more likely to censor himself or herself thereafter. The danger of self-censorship in this instance is self-evident. Such a pre-clearance requirement may even have an inhibiting effect on those who might ultimately receive permission to speak. Weaver v. United States Information Agency, 87 F.3d 1429 (D.C.Cir.1996) (Wald, J., dissenting at 1444). By mandating approval from an employee's superior, employees critical of the agency "will naturally hesitate to voice their [dissenting views] if they must first ask permission from the very people whose judgment they call into question." Harman, supra, 140 F.3d at 120. And even if the employee does choose to *630 speak, the challenged procedure may very well induce him to exercise "excessive caution" regarding the content of that speech. Cf. Weaver, supra, 87 F.3d at 1455 (Wald, J. dissenting) (quoting Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 390, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973)).
The kind of approval procedure mandated by Regulation 19(a) is generally disfavored under First Amendment law and has been routinely invalidated. See, e.g., Harman, supra (press policies of city social services agencies, requiring employees to obtain permission before speaking to media regarding agency policies or activities, restricted First Amendment rights of city employees; by mandating approval from employee's superiors, policies would discourage speakers with dissenting views from coming forward, they provided no time limit for review to ensure that commentary was not rendered moot by delay, and they lacked objective standards to limit discretion of agency decision-maker.); Latino Officers Ass'n. v. Safir, 170 F.3d 167 (2d Cir.1999) (holding that plaintiffs had not adequately demonstrated that there is a real threat that notice and reporting alone, divorced from the approval and supervision requirements of the New York Police Department procedures, will chill their speech but strongly implying that the more onerous "approval" burden is constitutionally troublesome as such would afford the city the opportunity to suppress or delay speech expressing dissenting views.); Spain v. City of Mansfield, supra (fire department rules which required prior approval of fire chief or service safety director before assistant fire chiefs were permitted to speak out on fire department matters were facially unconstitutional prior restraints on First Amendment guarantee of freedom of speech; rules contain no standards governing the approval process.); Wolf v. City of Aberdeen, 758 F.Supp. 551 (D.S.D. 1991) (municipal ordinance that prohibited city employees from commenting on internal business decisions or department rules or regulations, at any time, without first clearing those comments with department head was unconstitutionally overbroad and violated city fire fighters' First Amendment rights to speak out on matters of public concern.).
Indeed, courts have struck down, as unconstitutional prior restraints, regulations that burdened speech far less directly than Regulation 19. Thus, in NTEU, supra, the United States Supreme Court invalidated a content-neutral statute that imposed only an indirect burden on employee speech by banning honoraria and denying other compensation. 115 S.Ct. at 1014. Similarly, in Sanjour, supra, the Court of Appeals for the D.C. Circuit struck down a regulation that permitted reimbursement for only those speaking engagements consistent with the "mission of the agency" as an indirect restriction on anti-government speech. 56 F.3d at 96-97.
The power to suppress speech in advance also distinguishes the instant case from Weaver. In Weaver, the D.C. Circuit upheld a regulation requiring employees of the United States Information Agency to submit all teaching, writing, and speaking materials relating to matters of "official concern" to the agency for review before publication. Weaver, 87 F.3d at 1431. The majority accepted the government's narrowing construction of the regulation as allowing the agency only to advise employees of potentially inaccurate or disruptive statements, but not to grant any authority to prohibit publication or to punish an employee for publishing materials which had been found offensive under pre-publication review. Id. at 1439. The majority noted, however, that if the regulation were read to authorize punishment or suppression of speech in advance, as the regulation in this case clearly does, then the regulation would "raise serious constitutional issues." Id. at 1436.[10]
*631 To sum up, Regulation 19(a) and (b) is a proscriptive regulation of the public speech of all members of the State Police. This policy suffers from the same infirmities as the New York City child welfare agency press policy in Harman insofar as it provides no time limit for review and no objective standards by which to measure that review. At best, Regulation 19(a) and (b) delays speech; at worse, it suppresses speech either directly or indirectly by likely discouraging those with dissenting views from coming forward. In the context of the Pickering balance, these detriments of prior restraint weigh heavily against the government and justify "an additional thumb on the employees side of [the] scales." Sanjour, supra, 56 F.3d at 97. See also, NTEU, supra, 513 U.S. at 468, 115 S.Ct. at 1014; Harman, supra, 140 F.3d at 120. Accordingly, plaintiffs' right to speak on matters of public concern without the restraints of either prior approval or subsequent discipline constitutes a substantial interest on their part for purposes of influencing the Pickering balancing test.
(vi) The Government's Interest
On the other side of the equation are those interests of the government, as employer. By way of illustration, Pickering listed several specific examples of legitimate employer concerns: confidentiality; the maintenance of discipline by immediate superiors; the preservation of harmony among co-workers; the fostering of personal loyalty and confidence when necessary to the proper functioning of a particular working relationship or employment position; the promotion of efficiency in government operations; and the ability of the government to rebut false statements made by its employees without undue difficulty. 391 U.S. at 568-73, 88 S.Ct. 1731.
These interests are obviously heightened in the national defense and security environments where the special characteristics of military and intelligence gathering operations have traditionally and uncritically exempted these agencies from the prior restraint doctrine. See, Parker v. Levy, 417 U.S. 733, 744, 758, 94 S.Ct. 2547, 2556, 2563, 41 L.Ed.2d 439 (1974); Snepp v. United States, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980). Indeed, the Supreme Court has ranked government's interest in protecting classified national security information and sources as a compelling one, justifying broad prepublication clearance requirements. Snepp, supra, 444 U.S. at 509 n. 3, 100 S.Ct. at 766 n. 3. Thus, in Snepp the Supreme Court upheld the validity of a written agreement by a former CIA agent requiring him to submit all CIA-related writings for prepublication clearance by the agency, a requirement designed to ensure the protection of classified information. In its ruling, which even applied to materials which did not contain classified information, the Court found that "[w]hen a former agent relies on his own judgment about what information is detrimental, he may reveal information that the CIAwith its broader understanding of what may expose classified information and confidential sourcescould have identified as harmful." Id. at 512, 100 S.Ct. at 766.
Similarly, in Weaver v. United States Information Agency, supra, the D.C. Circuit upheld a United States Information Agency prepublication review process designed to protect against inadvertent disclosure of classified and other sensitive information affecting the foreign relations of the United States. Weaver, 87 F.3d at 1433-34. While the information sought to be protected in Weaver was not as critical to national security interests as that in Snepp, neither was the review requirement as onerous, since that agency had no authority to prohibit publication of materials it found offensive.
*632 And in Brown v. Glines, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980), the Supreme Court upheld an Air Force regulation prohibiting service members from soliciting signatures on petitions on base without their commander's approval, on the basis of the "different character of the military community and of the military mission ... [with its] overriding demands of discipline and duty." Id. at 354, 100 S.Ct. at 599. The Court found that the regulations, which significantly enough contained substantive safeguards preventing commanders from stopping the distribution of materials that merely criticized the Government or its policies, "protect a substantial Government interest unrelated to the suppression of expression" and "restrict no more speech than is reasonably necessary to protect the substantial governmental interest." Id.[11]
To be sure, a police department is a military-type organization where discipline must be enforced. Rosko v. Pagano, 466 F.Supp. 1364, 1369 (D.N.J.1979); State v. State Troopers Fraternal Ass'n., 134 N.J. 393, 415-17, 634 A.2d 478 (1993); City of Newark v. Massey, 93 N.J.Super. 317, 323, 225 A.2d 723 (App.Div.1967); Watts v. Civil Service Bd. for Columbia, 606 S.W.2d 274, 281-82 (Sup.Ct.Tenn.1980). Yet significant differences in the character of these respective environments militate against extending the restrictive doctrines governing the military to police departments. See Note, Limiting Public Expression by Public Employees: The Validity of Catchall Regulations, 18 Hous. L.Rev. 1097 (1981); Note, Nonpartisan Speech in the Police Department: The Aftermath of Pickering, 7 Hastings Const. Law Quarterly, 1001, 1013-1014. See also, Muller v. Conlisk, 429 F.2d 901, 904 (7th Cir.1970). Cf. Gasparinetti v. Kerr, 568 F.2d 311, 315 (3d Cir.1977); Fire Fighters Assoc., District of Columbia v. Barry, 742 F.Supp. 1182, 1185 n. 25 (D.D.C.1990); Baron v. Meloni, 556 F.Supp. 796, 800-01 (W.D.N.Y.1983). For purposes of First Amendment analysis, police are not relegated to a watered-down version of constitutional rights. Garrity v. New Jersey, 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); Flynn v. Giarrusso, 321 F.Supp. 1295, 1297 (E.D.La.1971).
No doubt, in certain contexts, the government is entitled to regulate police activity to a much greater extent than "civilians." Gasparinetti v. Kerr, supra. The State, therefore, has a significant governmental interest "in regulating some speech of police officers in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution." Id. at 315. Nonetheless, the restrictive effect of such regulation may extend only as far as is necessary to accomplish a legitimate governmental objective. Id. at 315-16.
As noted, where, as here, public employee speech involves a matter of public concern, the government bears the burden of justifying its adverse employment action. NTEU, supra, 513 U.S. at 466, 115 S.Ct. at 1013. And as the magnitude of the intrusion on employees' interests rises, so does the government's burden of justification. Id. 513 U.S. at 483, 115 S.Ct. at 1021. Thus, where the government singles out expressive activity for special regulation to address anticipated harms, the government must "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Id. 513 U.S. at 475, 115 S.Ct. at 1017. Moreover, the government's burden is even greater where the restraint on expression is accomplished through a generally applicable regulation, as opposed to a particularized disciplinary *633 action. In that event, the government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "necessary impact on the actual operation" of the Government. Pickering, 391 U.S. at 571, 88 S.Ct. at 1736. In other words, the regulation's sweep must be "reasonably necessary to protect the efficiency of the public service." NTEU, supra, 513 U.S. at 475, 115 S.Ct. at 1017.
Here, the government's proffered justifications for Regulation 19 have not been as clearly identified as the countervailing interests of the plaintiff employee class. As best can be determined, defendant asserts Regulation 19 is necessary to: (1) protect sensitive, confidential information; (2) promote public confidence and internal morale; (3) maintain proper obedience and discipline; and (4) advance the efficient functioning of the State Police.
These are surely all legitimate agency interests worthy of protection. Hall v. Pennsauken Tp. Mayor, Etc., 176 N.J.Super. 229, 232, 422 A.2d 797 (App.Div.1980). However, based on the record to date, defendant simply has not demonstrated that these concerns are in any way implicated by plaintiffs' proposed speech or that the threat it perceives to these interests is real rather than imagined. Even if the harms defendant aims to protect against somehow may be considered more concrete, Regulation 19(a) and (b) is not narrowly tailored to address these concerns but rather sweeps far more broadly than necessary to advance the legitimate interests of the State Police.
Principal among the concerns cited by the State Police is the protection of sensitive, confidential information. Indisputably, the agency has a legitimate interest in regulating the disclosure of confidential information. However, plaintiffs do not assert any right to disclose such information (at least as defined by statute or regulation other than Regulation 19(b)) and defendant has not shown that plaintiffs' proposed speech presents such a risk. On the contrary, plaintiffs expressly disavow any intention of disclosing confidential information. Rather their proposed speech deals with matters already the subject of media accounts, official executive reports, legislative hearings and judicial proceedings and are well out in the public domain. It is difficult, indeed, to see how defendant's posited fears will be realized by allowing plaintiffs to join the public debate.
Curiously, defendant appears willing to tolerate such speech if voiced by attorney spokespersons for plaintiffs but not plaintiffs themselves, yet fails to explain why the threat of a breach of confidentiality is any less real in the case of the former, casting further doubt on its asserted interest. Of course, there is always the risk of inadvertent disclosure but defendant also hasn't shown that the agency has a genuine problem with inadvertent employee release of confidential information.
This situation contrasts sharply with that of Snepp, supra which involved not only highly sensitive national defense and security information, but as well a demonstration of actual harm. In its ruling, the Court took pains to point out: "Undisputed evidence in this case shows that a CIA agent's violation of his obligation to submit writings about the Agency for prepublication review impairs the CIA's ability to perform its statutory duties." 444 U.S. at 512, 100 S.Ct. at 767. The basis for that finding included evidence that "sources" had discontinued working with the CIA after Snepp had published his book, citing fear that the CIA could not effectively keep their identities secret. Id. at 512-13, 100 S.Ct. at 766-67. Here, on the other hand, evidence of any real threat to the security of confidential, sensitive State Police information by permitting plaintiffs' proposed speech is seriously wanting.
Equally fatal is defendant's failure to show that Regulation 19(a) and (b) is designed *634 to address the asserted harm in a "direct and material way." On the contrary, its sweeping prior restraint covers not only information deserving of protection such as operating procedures, patrol schedules and methods, manpower, deployment, assignments and the like as well as that information necessary in unsolved crimes, Kelly v. Sterr, 62 N.J. 105, 109-10, 299 A.2d 390 (1973), cert. den. 414 U.S. 822, 94 S.Ct. 122, 38 L.Ed.2d 55 (1973), but overreaches broadly to include all information regarding agency policies, practices or activities. In other words, official policy regulates not only information deemed "confidential" statutorily or by regulation, but any and all information obtained by a state trooper "in the course of and by reason of his official duty," regardless of its public or "non-official" status. There is truly a lack of fit between the State Police's purported interest and the sweep of its restriction. As such, Regulation 19(a) and (b) chills substantially more speech than is reasonably necessary to protect confidential information. See, Hall v. Pennsauken Tp., supra, 176 N.J.Super. at 233-34, 422 A.2d 797.
Defendant's other asserted justifications prove even more illusory. As Justice Brennan noted in his dissent in Brown v. Glines, supra, 444 U.S. at 370, 100 S.Ct. 594: "[l]arger, but vaguely defined interests in discipline or efficiency may all too easily become identified with officials' personal or bureaucratic preferences." They may also become the means by which "legitimate criticism is stifled, dissent within the [Division] repressed and abuse of power concealed." See, Gasparinetti, supra at 317 n. 18.
Defendant has proffered nothing more than supposition and prediction that plaintiffs' proposed speech will disrupt State Police operations, impede their ability to perform official duties, lower public confidence and morale and lessen efficiency. There is no evidence of any such effect actual or threatenedoccasioned by the proposed speech other than the vague and conclusionary opinion of the agency's third ranking executive officer who perceives it as eroding public trust and confidence in the State Police and possibly compromising ongoing agency civil and criminal investigations. These fears, however, fall far short of the serious threat to the efficiency and effectiveness of agency operations that a prior restraint would be necessary to combat. Moreover, whatever the minimal disruptive impact of plaintiffs' proposed speech, it simply pales in comparison to the massive amount of public criticism of police tactics such as racial profiling. Cf. Williams v. Alioto, 549 F.2d 136 (9th Cir.1977).
Undoubtedly, police organizations require close working relationships for which personal loyalty and confidence are necessary. Yet this characteristic cannot serve as a pretext for stifling legitimate speech or penalizing employees for expressing unpopular views. Here, plaintiffs' proposed speech arises in the context of a public debate over allegations of racial profiling by the State Police and in furtherance of efforts, they say, to end discrimination in agency employment. Plaintiffs' speech appears to be about their perception of systemic practices and policies, not individuals.[12] In any event,
*635 First Amendment protection attaches despite the fact that employee statements on matters of public concern may be directed at their nominal superiors. Pickering, supra, 391 U.S. at 574-75, 88 S.Ct. 1731.
The other predictive harm defendant cites is a loss of public confidence and morale in the Division. Aside from none having been proven, the short answer is that any internal tension or unease, or decrease in morale, that may follow in the wake of plaintiffs' comments regarding discriminatory practices which they believe merit reform "is the price the First Amendment exacts in return for an informed citizenry." Bowman v. Pulaski County Special School District, 723 F.2d 640, 646 (8th Cir.1983) (quoting Monsanto v. Quinn, 674 F.2d 990, 1001 (3d Cir. 1982)). But just as importantly, defendant has not explained why it is plaintiffs' proposed speech and not the alleged discriminatory and retaliatory practices of which they complain that should be deemed responsible for the lowering of public confidence and morale in its organization. Based on this record, it is more probable that any such effector for that matter any disruption to the efficiency of agency operationswould be the result of adverse public perceptions which are merely intended to be reflected in plaintiffs' proposed speech rather than precipitated by it. Stated otherwise, any controversy occasioned by allegations of discrimination within the State Police cannot be said to be caused by plaintiffs' proposed speech; they appear, rather, to be its inspiration. The bottom line is that public employers cannot rely on disruption which they have arguably instigated or exacerbated to outweigh an employee's First Amendment rights. Roth v. Veteran's Adm. of Government of U.S., 856 F.2d 1401, 1408 (9th Cir.1988); Zamboni v. Stamler, 847 F.2d 73, 79 (3d Cir.1988); Chico Police Officers' Ass'n. v. City of Chico, supra, 283 Cal.Rptr. at 621.
(vii) The Balance
As noted at the outset, the court's duty is to ensure the proper balance between the full protection of speech upon issues of public concern and the practical realities involved in the administration of a government office. Connick v. Myers, supra, 461 U.S. at 154, 103 S.Ct. at 1694. In this case, under these circumstances, plaintiffs' interests are transcendent.
On the one hand, the substance and character of their putative comments are of the highest public concern because they deal with questionable law enforcement tactics directly affecting the general populace. Also weighted heavily on their side is the fact that the official restraints of either prior approval or subsequent discipline, as applied to plaintiffs in this instance, have been total and direct, and as to the other agency employees, preemptive and proscriptive. In short, Regulation 19(a) and (b) significantly burdens employee rights and deprives the public of information on issues of vital public concern from those with a uniquely informed perspective.
Defendant's countervailing interests, on the other hand, although legitimate, simply fail to measure up. Defendant has not demonstrated a serious threat or harm as a result of plaintiffs' proposed speech, much less its "necessary impact" on the actual operation of the agency. Whatever the disruptive effect of plaintiffs' proposed speech, it would be minimal compared to the adverse publicity and public criticism of the very practices and tactics of which plaintiffs complain in their underlying lawsuit. As such, the interest of plaintiff employees and of the public in free expression outweigh the interests of the State as employer.
*636 Even if defendant's case were stronger, and the balance of interests closer, the challenged scheme would be vulnerable to constitutional attack nevertheless as not precisely tailored to meet the government's legitimate concerns. On this score Regulation 19 suffers from dual flaws: (1) the advanced nature of section (a)'s review and approval process which contains no time constraint or objective standards to limit the agency's discretion; and (2) section (b)'s all-encompassing definition of protected information which embraces far more than included within traditional notions of confidentiality and secrecy. Both these detriments operate to regulate, and therefore restrict, a far broader range of speech than is reasonably necessary to advance the claimed purpose of the official policy. Stated somewhat differently, these restrictions convey too cramped a conception of First Amendment rightsone that impermissibly views public speech as a mere option but administrative convenience, an imperative.
CONCLUSION
Consequently, sections (a) and (b) of Regulation 19 are likely to be found unconstitutional and therefore plaintiffs are likely to prevail on the merits of their claims at trial.[13] Plaintiffs have also successfully demonstrated irreparable harm in the absence of preliminary injunctive relief and that the balance of equities as well as the public interest weigh decidedly in their favor. Accordingly, plaintiffs' motion for a preliminary injunction, as it applies to sections (a) and (b) of Regulation 19, is granted.
NOTES
[1] See, Rankin v. McPherson, 483 U.S. 378, 386 n. 9, 107 S.Ct. 2891, 2897 n. 9, 97 L.Ed.2d 315 (1987); Connick v. Myers, 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); Roth v. Veteran's Admin. of Government of U.S., 856 F.2d 1401, 1405, 1407 (9th Cir.1988); Spain v. City of Mansfield, 915 F.Supp. 919, 923 (N.D.Ohio 1996); Chico Police Officers' Ass'n. v. City of Chico, 232 Cal. App.3d 635, 283 Cal.Rptr. 610, 616, 619 (Cal. Ct.App.1991); Los Angeles Teachers Union v. Los Angeles City Bd. of Education, 71 Cal.2d 551, 78 Cal.Rptr. 723, 455 P.2d 827, 835 (1969); Brukiewa v. Police Commissioner of Baltimore City, 257 Md. 36, 263 A.2d 210, 220 (Md.Ct.App.1970).
[2] On June 18, 1997, defendant New Jersey Department of Law and Public Safety, Division of State Police ("State Police" or "Division") filed a Notice of Removal to the federal court. On October 15, 1997, plaintiffs amended their Complaint to include Trooper William Sweeney's claims under 42 U.S.C. § 1981 and LAD. On March 15, 1999, defendant moved the federal court to dismiss plaintiffs' state law claims on the ground of Eleventh Amendment immunity; and on or about March 27, 1999, the parties consented to remand the entire action back to state court.
[3] "Racial profiling" has been defined broadly to encompass any action taken by a law enforcement official during a traffic stop that is based upon racial or ethnic stereotypes and that has the effect of treating minority motorists differently than non-minority motorists.
[4] Thus Regulation 19 also provides that: "[n]othing contained herein shall be construed as denying to the public information they have a right to obtain from the Division, pursuant to law."
[5] On February 24, 1999, plaintiffs Sgt. Yusuf El-Amin and John Perry submitted "Special Reports" requesting permission to speak to the media. Similar requests were made by plaintiffs Alvin Smith, Victor Cooper and Darryl Beard on February 25, 1999; plaintiffs Paul Sinckler, Roger Lee Johnson, Michael Travis and James Smith on February 26, 1999; and plaintiff Arnie Abram on March 8, 1999.
[6] New Jersey state constitutional guarantees of speech are coterminous with those of the First Amendment. Hamilton Amusement Center v. Verniero, 156 N.J. 254, 264, 716 A.2d 1137 (1998); Shelton College v. State Bd. of Ed., 48 N.J. 501, 226 A.2d 612 (1967).
[7] Plaintiffs raise a facial challenge to Regulation 19, however under the Pickering/NTEU test, the distinction between facial and as applied constitutional challenges becomes unimportant. See, Harman v. City of New York, supra, 140 F.3d at 118. See also, Sanjour v. Environmental Protection Agency, 56 F.3d 85, 92 (D.C.Cir.1995) (en banc), noting that the NTEU test, which requires a reviewing court to go beyond the facts of the case before it in considering the interests of "`a vast group'" of both present and future employees as well as the interests of "`potential audiences'" in "`a broad range of present and future expression,' " presumably applied to both types of challenge (quoting NTEU, 513 U.S. at 468, 115 S.Ct. at 1014). However, as Harman recognized, the concerns that lead courts to invalidate a statute on its face may be considered as factors in balancing the relative interests under Pickering. 140 F.3d at 118. See, e.g., NTEU, supra, 513 U.S. at 468, 115 S.Ct. at 1014. Thus, the detriments of prior restraints are among the factors to be considered in applying the Pickering test to a "notice and pre-approval" regulation as is involved herein. See, Weaver v. United States Information Agency, supra, 87 F.3d at 1440.
[8] This is not to suggest necessarily that the newsworthiness of an item should be the measuring stick of public concern since such a "headline test" would undermine the First Amendment's historic neutrality with respect to the impact of expression. See, Cover. The Supreme Court 1982 Term Foreword: Nomos and Narrative, 97 Harv.L.Rev. 4, 172 n. 65 (1983).
[9] As previously noted, plaintiffs have no protected interest in releasing information deemed "confidential" pursuant to statute or regulation other than, of course, Regulation 19(b) whose constitutionality they are challenging in this case. Plaintiffs concede this much and therefore the evaluation has been of the interests of employees and of the public only in commenting on non-confidential agency policies, practices and activities.
[10] Similarly distinguishable is Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), where the regulation at issue, allowing termination of federal employees for "such cause as will promote the efficiency of the service," was a mechanism for punishment after speech had occurred. It did not implicate the same prior restraint concerns as Regulation 19 does here. See, NTEU, supra, 513 U.S. at 467 n. 12, 115 S.Ct. at 1013 n. 12.
[11] In formulating this two-part test, the Brown Court seems to have veered from the Pickering balancing test in favor of some version of the "intermediate scrutiny" test applied in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), presumably because of the special considerations attending the military.
[12] Plaintiffs' proposed comments differ fundamentally from the insulting, vitriolic, defamatory remarks of subordinate officers against their immediate superiors found threatening to the significant working relationships vital to the administration of the police departments in both Magri v. Giarrusso, 379 F.Supp. 353 (E.D.La.1974) and Kannisto v. City of San Francisco, supra, 541 F.2d at 842. In the former, a police sergeant called his superintendent a "coward" and a "liar" and made obviously false comments about the superintendent impounding police overtime funds to cause internal strife in the police department. In the latter, a police lieutenant made disrespectful and belittling remarks about a superior officer's personality while addressing his subordinates during a morning inspection.

Nor is it claimed herein that plaintiffs' proposed comments seek to spread malicious gossip about co-workers or misrepresent agency positions, or will be made with reckless disregard of the truth or as official spokespersons for the Divisionall of which, along with the insubordinate comments in Magri, supra and Kannisto, supra, have been found to be constitutionally unprotected.
[13] It bears repeating that this ruling does not concern the Division's regulation, or handling of employee requests to disseminate or distribute agency documents pursuant to section (c) of Regulation 19. It is simply noted, in this regard, that official Division policy grants access to materials to which the public is entitled under law.